**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**HOWARD MONROE**                                                                 **PLAINTIFF**

**V.**                                              **CIVIL ACTION NO.: 3:17CV-960-WHB-JCG**

**WWL VEHICLE SERVICES AMERICAS, INC.;**
**And JOHN DOES (1-10)**                                                    **DEFENDANTS**

<u>**MEMORANDUM IN SUPPORT OF DEFENDANT'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW Defendant WWL Vehicle Services Americas, Inc. ("VSA") and files this

Memorandum in Support of its Motion for Summary Judgment under Fed. R. Civ. P. 56(c) as to

all of Plaintiff Howard Monroe's Claims ("Plaintiff"). In support thereof, VSA would show unto

the Court the following:

<u>**INTRODUCTION**</u>

Plaintiff Howard Monroe began working for Defendant WWL on October 26, 2009.

WWL operates a large facility in Canton, Mississippi where it services Nissan. WWL has

comparable operations in Smyrna, Tennessee, and also has locations in other states and countries

that vary in size and scope of work. Plaintiff held various positions until he was promoted to

General Manager on February 7, 2014.  The General Manager is the highest position onsite for

each facility and requires oversight of every aspect of the facility's work and employees. The

General Manager reports to a Vice President within the company who oversees multiple

facilities.  Plaintiff worked in this position until his termination on February 1, 2017.  The

demands of the General Manager job are intense. Plaintiff demonstrated an ongoing failure to

meet those demands for some time, which was documented by WWL in various performance

reviews and communications with his supervisors. Ultimately an investigation into a serious

53230669

facility problem and a complaint from an employee that Plaintiff was instructing him not to do his job properly led WWL to conclude that Plaintiff's employment must be terminated.

After filing an EEOC charge and receiving a right-to-sue letter from the EEOC on September 8, 2017, Monroe filed this lawsuit on December 5, 2017. [Doc. 1] He makes race discrimination claims under Title VII and §1983. He also alleges negligence and intentional and negligent infliction of emotional distress. As shown below, Plaintiff's claims fail as a matter of fact and law.

## FACTS AND BACKGROUND

WWL's Canton location processes vehicles for the Nissan plant in Canton. (Ex. 1, Plaintiff Dep. 33)[1] Plaintiff began working for WWL in 2009 as an Operations Manager. *Id.* At 18. In early 2014, Plaintiff Monroe was promoted to the role of General Manager, which is head of operations at WWL Canton, Mississippi facility. (Ex. 2, General Manager Job Description) Each WWL location is operated by a General Manager; the General Manager is responsible for all operations and all employees at the site; it is the most senior position at each location. *Id.* Plaintiff acknowledges that in the General Manager role, the "buck stopped with him" at the Canton facility. (Ex. 1, Plaintiff Dep. 20)

Plaintiff held the General Manager position for approximately three years until his termination on February 1, 2017. Plaintiff demonstrated poor performance throughout his tenure as General Manager. His performance was documented by WWL in various performance reviews and communications with his supervisors, as well as a Performance Improvement Plan, discussed in more detail below. Sergio Gutierrez, the supervisor at Plaintiff's termination, also offered detailed testimony regarding the deficiencies in Plaintiff's leadership and performance.

---

[1] All exhibits referred to in this Memorandum are the Exhibits attached to Defendant's Motion for Summary Judgment and are incorporated herein.

In addition to his ongoing poor leadership, an investigation into two issues at the facility brought to light a lack of trustworthiness on Plaintiff's part and confirmed Plaintiff's unsuitability for the position.  Once the investigation results were provided to Mr. Gutierrez, he and others with whom he consulted at the company felt there was no option but to terminate Plaintiff's employment.

**Plaintiff's Performance Under Supervisor Harrison (No Alleged Discrimination)**

Plaintiff's supervisor at the time of his promotion in early 2014 was Vice President Joseph "Greg" Harrison.  (Ex. 1, Plaintiff Dep. 20)  Plaintiff makes no allegation of discrimination during the time period that he was supervised by Mr. Harrison. *Id.* at 39.  Mr. Harrison conducted one evaluation of Plaintiff before retiring from his position. (Ex. 3, Harrison Performance Evaluation)  In that evaluation, Mr. Harrison noted certain areas that needed improvement.  *Id.*  Those specific areas included comments by Mr. Harrison of "multiple high visibility repetitive concerns this past year e.g. monroney labels missing, damage disclosure errors" in the section related to being "Customer Centered."  *Id.* at WWL 000087.  He noted that Plaintiff needed to move to more of a "coaching/mentoring role balancing task execution focus with strategic thinking" and to shift the overall focus in Canton away from non-controllable issues and focus on improving those areas that are able to be improved.  *Id.* at WWL 000087-000088. Mr. Harrison also specifically noted that "internal damage is excessive and a major contributor to KPI miss as noted" ("KPI" are "Key Performance Indicators," used to evaluate employee performance based largely on objective customer requirements); internal damage proved to be an ongoing problem under Plaintiff's leadership as noted in Mr. Gutierrez's evaluations and testimony.  *Id.* at WWL 000092.  Mr. Harrison noted that "WoW compliance" by Plaintiff was necessary; "WoW" is the WWL "Way of Working" that sets out comprehensive

expectations to be applied throughout the company. *Id.* at WWL 000091.  Overall, Mr. Harrison noted that for fiscal year 2014, Canton's performance "fell short of expectation." *Id.* at WWL 000089.

In 2015, Greg Harrison retired and Sergio Gutierrez moved into his position and began supervising Plaintiff.  (Ex. 1, Plaintiff Dep. 21)  Mr. Gutierrez began working for WWL in Mexico City, Mexico before being moved into this position in the United States. (Ex. 4, Gutierrez Dep. 9-10) Mr. Gutierrez was then responsible for handling Plaintiff's mid-year and annual evaluations.  Those evaluations continued to reflect a number of areas that needed improvement, many of which were no different than the areas highlighted previously by Mr. Harrison.

**Plaintiff's Performance Under Supervisor Sergio Gutierrez**

When Mr. Gutierrez moved into the Vice President role supervising Plaintiff, he considered Plaintiff "a very pleasant employee to deal with. I mean, he's a very nice gentleman, personally speaking. So I needed to recognize the fact that he was showing some willingness, but the performance was still not going to the positive direction."  (Ex, 4, Gutierrez Dep. 47-48)

Mr. Gutierrez spent a great deal of time in Canton when he became Plaintiff's supervisor, traveling to the Canton facility approximately every two weeks. *Id.* at 70.  They were working closely to improve the administration and function of the Canton site.  *Id.* at 72.  Mr. Gutierrez believes that "Everyone deserves the chance and an opportunity to really do better…."  *Id.* at 48.

To the extent that Canton's financials were positive or improving during this time, those results were accomplished largely despite Plaintiff, and through the very hands-on and detailed guidance of Mr. Gutierrez.  Mr. Gutierrez explained during his deposition:

> Howard didn't led the team to accomplish all those goals. He
> needed a lot of -- a lot of kind of extra guidance, extra training,

extra support. He was capable to focus on one and only of all the five that I described. And he required constant support from our company, from external players.

So ultimately, yeah, he was a general manager. He was in the seat. That doesn't mean that he was actually leading the actions, leading the efforts, meeting with the employees, meeting with the customer, putting the actions and follow-ups to achieve that….. I was doing it here myself with my team…. I was guiding him, pretty much telling him exactly where to go, how to go, how to move. And every time I needed to go back home and I – then I came back, I was noticing that we had kind of a – missed a step again. So we had agreed, "Okay. These are the things we need to do in the following 15 days, Howard. Okay. 15 days later I was back. Okay. Let's see the evidence. Let's see where we are. It was not implemented. It was not follow up. It was not executed. Or he just changed the plan. Over and over and over again.

The team that came or used to come here to help with him was constantly, as well, providing feedback about that, saying, we implemented this two weeks ago. We went back again. It's no longer in place. He change it again. He didn't follow it. He didn't stick to the plan. And so on and so….

He was not replicating, emulating the things that he was trained on and the direction he was given to go. He was the general manager, and my role was to support him, to guide him, to make him successful. If I could have been here and do his job directly, I will have him – put him in a bad spot. He will be just like a puppet there. That was not the case.

What I'm saying is that I was working with him, shoulder to shoulder, reviewing things, reviewing actions, implementing things. Once we were in the same agreement, I was going back. 15 days later I was coming back to follow up on those agreements we have made to find out that those were not followed, not accomplished, not respected. And we had to it over and over again numerous times.

*Id.* at 69-72.

The mid-year and annual performance evaluations completed by Mr. Gutierrez reflected

Mr. Gutierrez's testimony regarding Plaintiff's poor leadership in the General Manager role. His

reviews reflect a continued and serious failure to properly implement the company's

53230669

comprehensive WoW system (Ex. 5, Gutierrez Evaluations at WWL 000103, 000119), ongoing

high volume of damages and damage repair timeliness (*Id.* at WWL 000104, 000118), a

continued need for a change in attitude to focus on the areas that can be improved (*Id.* at WWL

000107).  These are the many of the very same issues reflected in Mr. Harrison's evaluation of

Plaintiff prior to his retirement, as noted above.  Mr. Gutierrez also offered positive comments or

acknowledged improvement where appropriate and communicated his ongoing support of

Plaintiff in each performance review. *See, e.g., id.* at WWL 000107, 000117, 000127, 000132.

In his review of the year 2015, Mr. Gutierrez provided a summary of his comments that

noted Plaintiff's "ability to manage this large group is questionable" and stated that he must

achieve the specific goals outlined to show that "he is ready to move forward and to take Canton

to a less chaotic way of operating. *Id.* at WWL 000127.  Mr. Gutierrez continued, "Howard had

received constant feedback and now is his turn to use it wisely to change the course of actual

tendency. I am here to help him at any given moment, I truly believe that he can manage this

place and processes in a more assertive way and I am committed to his future success." *Id.*

In January 2016, Mr. Gutierrez placed Plaintiff on a Performance Improvement Plan that

addressed a number of the problems identified in his reviews, including but not limited to

implementation of the company's specific WoW systems and procedures.  (Ex. 6, Improvement

Plan)

Despite the continued failures in Plaintiff's leadership, Mr. Gutierrez did not initially

want to terminate Plaintiff's employment.  (Ex. 4, Gutierrez Dep. 132)  In fact, Mr. Gutierrez

made the recommendation to his superiors that Plaintiff be kept on at the company but moved to

a different role where he might be more successful. *Id.* at 135.  Mr. Gutierrez testified that

> I want him to succeed. I want him to have the chance to learn, be
> trained, learn and do better. Personally, I like him a lot. He was

enjoyable to work with. After finally understanding his failures in the leadership role, I was – I was very well aware that he had some other good skills kind of learned through the time that he was there performing the job. Not as general manager. But certainly as an operator, certainly – certainly in a different capacity. So my—my goal was, hey, let's – let's keep working with Howard because he has pretty much earned all this knowledge through time. He – he is not a – he is not the general manager that we are going to need for the future meaning that he's not capable to change—he never showed me that he was capable to mature that – those skills to that level.  But that didn't mean that he was a person that needed to be exited because of whatever reason. I was trying to groom and mentor him, if you will. I always – I thought, after a period of time that Howard could have been a project manager, which is different than a project – than a manager of people. So in charge of projects to implement things. That's what – that's where my thought was.

*Id.* at 133-134.

## 2016 Investigation

In August and September of 2016, Regional HR Manager, Lynne Godfrey, whose office is housed at the Canton facility, received and investigated two complaints.  (Ex. 7, Godfrey Dep. 95)  Mr. Gutierrez was not involved in the investigation process in any way.  (Ex. 4, Gutierrez Dep. 139)

With regard to the first complaint, Ms. Godfrey received a call from a doctor who was treating a sick WWL employee; the doctor was trying to determine what materials the employee was exposed to during work to aid in a diagnosis. (Ex. 7, Godfrey Dep. 95)  In the process of requesting the Material Data Safety Sheets and obtaining the needed information, she learned that the air conditioner had not been working in the paint mix room for many months and that the room was dangerously hot.  *Id.* Employees were required to mix paint in these conditions.

Around the same timeframe, Ms. Godfrey received a second complaint from employee Robert Renfroe.  He expressed concern to Ms. Godfrey that he was being directed by Plaintiff to stop writing damage estimates when there were plenty more damaged vehicles to write up each

7

month, and when one of his job responsibilities included timely estimating internal damages.  *Id.*
Ms. Godfrey looked into both issues by pulling relevant documents and interviewing a number
of employees. *Id.* at 97-99; Ex. 8, Investigation Report.  She compiled employee statements,
including one from Plaintiff, and prepared an Investigation Report that summarized her findings
on both issues. *Id.*

Ms. Godfrey made no specific recommendations regarding Plaintiff's employment. *Id.* at
96.  She instead submitted her report to LaTonya Robertson. *Id.* at 97. Ms. Robertson, who is
black, was serving as the Employee Relations Manager at the time.  *Id.* at 112.  Ms. Robertson
and Brent Schoolcraft, Director of Human Resources, compiled a document titled "Investigation
Recommendations," which they provided to Mr. Gutierrez.  *See* Ex. 9, e-mail communications
between Brent Schoolcraft and LaTonya Robertson, and Ex. 10, Investigation
Recommendations. Mr. Gutierrez was provided with the Investigation Report and Investigation
Recommendations. (Ex. 4, Gutierrez Dep. at 139-140)

The Investigation Report includes statements from multiple employees explaining,
among other things, the circumstances under which Plaintiff would instruct employees to stop
writing damage estimates for vehicles damaged at the facility, in contravention of WWL policy
and Nissan requirements.  (Ex. 8, Investigation Report)  Emails between Plaintiff and various
employees are attached to the investigation report to support this finding.  *Id.*  During the
investigation, Plaintiff's explanation was that he told employees to stop writing estimates so that
the employees could catch up on handling the actual repairs.  *Id.*  However, other employees
stated that writing estimates did not interfere with handling repairs. *Id.*  At least one employee
interviewed during the investigation also stated to Ms. Godfrey that Plaintiff gave the instruction
to stop writing estimates so that damage numbers would appear to be less than what actually

existed in order for the facility to look better on paper. *Id.* Indeed, the estimate totals pulled by Ms. Godfrey reflected monthly totals that were close to the "goal" numbers set for Plaintiff, when, in fact, the real amount of damages was much higher. *Id.*

Further, WWL learned in the investigation into the conditions of the paint mix room that Plaintiff was aware of the safety issue with the HVAC system not working in the paint room several months earlier, even though Plaintiff claimed that he did not learn of the problem until Ms. Godfrey brought it to his attention through the investigation. *Id.* The investigation report attaches emails demonstrating that Plaintiff had been made aware of the problem in the paint room much earlier but had failed to remedy the hazardous condition. *Id.*

**Termination of Plaintiff's Employment**

Upon reviewing the Investigation Report and Investigation Recommendations, Mr. Gutierrez knew that the company must replace Plaintiff. (Ex. 4, Gutierrez Dep. 107-108) Mr. Gutierrez explained as follows:

> The situation change when, I guess, all the signals about poor performance and leadership – poor leadership performance were kind of confirmed through the facts found in the investigation. So I guess everything – everything – everything changed. So, for example, the issues that we had with the paint booth, the HVAC system which controls the fumes inside the body shop were things that we discussed for months in order to – to kind of do something for our employees. And I was always told, it's done. It's done. It's done. It's done. It's done. But then it was confirmed with all those details that were there, that It was never done. It never took place. So that was the first time that I thought what – well, hold on, now, why – why do you told me that everything was done? Why did we confirm that we were moving forward, to find out now that it was never executed? I remember days where – when I told him, you know, it's not about the cost, Howard. This is about the safety and well-being of our employees. Get it done. We need to fix this things. To find out that he never took place. So that's one thing. The other thing was, there was a point in time when suddenly some indicators started to look better, but the level of frustration on the team started to become too evident. I'm talking about those

> damages—damages and repairs of those damages. And the point
> was when we made it all the way and we, fiscally speaking, closed
> 2017, there was a – there was a weird hiccup. And the hiccup
> because we were trending positively in the damage calculation.
> And suddenly, at the end of the fiscal year, was like, oh, this month
> was really bad, Sergio. Sorry. Surprise….

*Id.* at 137-138.  Mr. Gutierrez testified that he was "conflicted" after investing so much time in

working with Plaintiff:  "And some part of me was telling me, okay, it may look better. But then

the – this honesty portion of what we found make me really nervous as far as what else is out

there."  *Id.* at 143.

Mr. Gutierrez discussed Plaintiff's performance with his supervisor, John Felitto, and

with the Human Resources Department to make sure termination was the right decision and that

it was handled in the right way.  *Id.* at 26, 143.  Mr. Gutierrez ultimately concluded that

termination was the only reasonable option for the company; he was alarmed that "If a leader in

my team is capable to do this kind of things and then just lie about them and hide those actions or

non-actions, even if that can affect the well-being of our – of the rest of the employees, how can

I trust them on this situation?"  *Id.*

Plaintiff has argued that he was unfairly blamed. However, as he acknowledged, "the

buck stops with him" for the Canton facility.  (Ex. 1, Plaintiff Dep. 20)  He was responsible for

the entire Canton facility.  He was expected to communicate honestly and straightforwardly with

his supervisor.

**Relevant Events Post-Termination**

WWL moved Chris Beadle, a white General Manager, into Plaintiff's former role in

Canton.  (Ex. 4, Gutierrez Dep. 28)  Mr. Beadle worked for a little over a year in the GM role at

Canton before he left the company due to unsatisfactory performance.  (Ex. 11, Affidavit of

Brent Schoolcraft)  WWL then hired Kelvin Crockett, a black General Manager, to step into that

role. *Id.* Mr. Crockett began work in August 2018 and remains in that role as of the time of this filing. *Id.*

After his termination from WWL, Plaintiff was out of work for two weeks or less before he went to work for Vantec Hitachi, another Nissan supplier. (Ex. 1, Plaintiff Dep. 102-104) He worked there for just under a year before taking a job as Operations Manager at the Toyota Boshoku plant in Tupelo, Mississippi. *Id.* at 89. As Operations Manager in the Toyota structure, his position is the most senior role on the operations side at that location. *Id.* at 89-90. He is earning $90,000, comparable to his WWL salary, with bonus potential, cost of living adjustments, and a generous relocation package. *Id.* at 91-92.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(a). "The party moving for summary judgment must initially demonstrate the absence of a genuine issue of material fact. If the movant meets this burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs, Inc.*, 61 F. 3d 313, 315 (5th Cir. 1995) (citing *Celotex Corp., v. Catrett*, 477 U.S. 317, 324 (1986)).

To avoid summary judgment, the non-movant must demonstrate "significant probative evidence" that a genuine issue of material fact exists. *Hamilton v. Seque Software, Inc.*, 232 F. 3d 473, 477 (5th Cir. 2000). The non-movant is required to "submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause[s] of action." *Malacara v. Garber*, 353 F. 3d 393, 404 (5th Cir. 2003). The non-movant must also "articulate the precise manner in which the submitted or identified evidence supports his or her

53230669

claim." *Smith ex. rel. Estate of Smith v. United States*, 391 F. 3d 621, 625 (5th Cir. 2004).

However, "mere conclusory allegations are not competent summary judgment evidence, and

such allegations are insufficient, therefore, to defeat a motion for summary judgment." *Eason v.*

*Thaler*, 73 F. 3d 1322, 1325 (5th Cir. 1996). Put another way, conclusory allegations,

speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute

for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*,

276 F. 3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F. 3d 1093, 1097 (5th Cir. 1997); *Little v.*

*Liquid Air Corp.*, 37 F. 3d 1069, 1075 (5th Cir. 1994)(*en banc*).

Here, Defendant easily carries its burden of demonstrating there are no genuine issues of

material fact that would allow Plaintiff's claim to survive summary judgment. Other than

Plaintiff's own subject beliefs, speculation and conjecture, Plaintiff cannot submit any competent

evidence showing that his race was the but for cause of Defendant's decision to terminate him.

As a result, Plaintiff's claim and Complaint must be dismissed with prejudice.

## LAW AND ARGUMENT

I.   **WWL's Actions Were  Not Discriminatory.**

    A.  **Plaintiff's *prima facie* case of race discrimination.**

Plaintiff contends he was terminated because of his race in violation of Title VII and

Section 1981.[2]  In the typical Title VII discrimination case, where there is no "direct" evidence

of discrimination, a plaintiff must present "circumstantial evidence [of discrimination] … using

the framework set forth in the seminal case of *McDonnell Douglas Corporation v. Green*, 411

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell v. McKinney Hosp. Venture*, 235 F.3d

219, 222 (5th Cir. 2000); *see also Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254

---

[2] When a plaintiff pursues Title VII and Section 1981 as parallel causes of action, Title VII and Section 1981 require
the same proof to establish liability. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999).
Therefore, the analysis with regard to Plaintiff's federal claims applies to both Title VII and Section 1981.

(1981).

Plaintiff must "initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination." *Carter v. Miss. Dept. of Human Services*, 2006 WL 2827691, *3 (S.D. Miss. 2006) (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, (2000)).  To establish a *prima facie* case of race discrimination, Plaintiff must show "(1) [plaintiff] is a member of a protected group; (2) he was qualified for the position; (3) an adverse employment action occurred"; and (4) either "he was replaced by a person not in the protected group" or "persons outside the protected class were treated more favorably than he." *Parker v. Tyson Foods, Inc.,* 2007 WL 2021928, *5 (S.D. Miss. July 9, 2007); *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 512-513 (5th Cir. 2001).

In this case, Plaintiff is black (protected group) and his employment was terminated. A white employee was moved into Plaintiff's General Manager position after Plaintiff's termination. However, as shown below, WWL had legitimate, non-discriminatory, non-pretextual reasons for terminating Plaintiff's employment.

### B. WWL had Legitimate, Non-Discriminatory, Non-Pretextual Reasons for the Termination Decision.

Once Plaintiff has presented sufficient evidence to show a *prima facie* case of discrimination, "the burden then shifts to [WWL] to articulate - but not prove - a legitimate, nondiscriminatory reason for its employment decision." *Carter*, 2006 WL 2827691 *4 (citing *Reeves*, 530 U.S. at 142; *McDonnell Douglas*, 411 U.S. at 802).  The burden for WWL is one of production, not persuasion.  *Reeves*, 530 U.S. at 142.  To meet this burden of production, WWL "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, 'if believed by the trier of fact,' would support a finding that unlawful discrimination was

53230669

not the cause of the employment action." *Id.* (citing *Bauer v. Albemarle Corporation*, 169 F.3d 962, 966 (5th Cir. 1999), quoting *St. Mary's Honor Ctr. v, Hicks*, 509 U. S. 502, 515 (1993)). WWL has satisfied its burden of production by setting forth above the detailed evidence underlying its articulated non-discriminatory reasons for Plaintiff's termination.

In summary, multiple performance evaluations from two of Plaintiff's supervisors detailed deficiencies in Plaintiff's leadership and performance. *See supra,* pp. 3-7. Testimony from Mr. Gutierrez elaborates on those deficiencies in his deposition testimony. *Id.* Additionally, WWL's thorough "Investigation Report" with statements from multiple employees and other company records ultimately points to a lack of honesty and trustworthiness on Plaintiff's part, also discussed *supra*, pp. 7-9.

The evidence WWL presents to the Court "clearly sets forth . . . reasons for its actions which, 'if believed by the trier of fact,' would support a finding that unlawful discrimination was not the cause of the employment action." *Reeves,* 530 U.S. at 142. Because WWL meets its burden of production, the presumption of discrimination raised by Plaintiff's alleged *prima facie* case of discrimination "disappear[s], ... and the sole remaining issue [is] 'discrimination *vel non*.'" *Carter,* 2006 WL 2827691 *4 (citing *Reeves*, 530 U.S. at 142-43, quoting *Hicks*, 509 U.S. at 510).

### C.  Plaintiff Cannot Show the Reasons for Termination are Pretext For Discrimination.

To avoid summary judgment, Plaintiff must show either (1) "that [WWL's] reason is not true, but is instead a pretext for discrimination" or (2) "that [WWL's] reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). Plaintiff has the burden of proving that but for the alleged discriminatory purpose, the adverse employment

action would not have been taken.  *See Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005).  To show that WWL's reasons are merely pretext for discrimination, Plaintiff must point to a "genuine issue of material fact concerning pretext." *Moore v. Eli Lilly & Co.,* 990 F.2d 812, 815 (5th Cir. 1993).  In responding to WWL's articulated reasons, Plaintiff "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates" to avoid summary judgment.  *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 220 (5th Cir. 2001).

Plaintiff's pretext evidence must be sufficient to permit a jury to believe that WWL's reasons were false *and* that illegal discrimination was the actual reason for the termination decision.  *St. Mary's Honor Ctr.*, 509 U.S. at 515.  In other words, sufficient pretext evidence must "consist of more than a mere refutation of the employer's legitimate nondiscriminatory reason[s]"; instead, Plaintiff must offer "some proof that [the protected class, *e.g.*, race or the protected conduct] motivated the employer's action." *Moore,* 990 F.2d at 815-816.  "Conclusory allegations, speculation, and unsubstantiated assertions are inadequate." *Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir. 2002).  A plaintiff's "subjective belief that the defendants acted because of racial discrimination" is not sufficient to show that "defendants' stated reasons were a pretext for discriminatory motivations."  *Johnson v. Hinds County Public Works,* 2006 WL 2701195 *3 (S.D. Miss. 2006).

It is unclear what evidence Plaintiff alleges in an attempt to show pretext. Plaintiff testified that he suffered no alleged race discrimination until Mr. Gutierrez was hired into the role of supervising Plaintiff. (Ex. 1, Plaintiff Dep. 39)  He alleged that Mr. Gutierrez's poor performance evaluations of Plaintiff were discriminatory. However, as detailed above, many of the areas of improvement noted by Mr. Gutierrez in the evaluations were the same areas of improvement specifically noted by Mr. Harrison before him.  As detailed *supra*, pp. 3-6, those

areas include the necessity of properly implementing the company's WoW system, ongoing high volume of internal damages, and a need for a shift of attitude and perspective regarding leading and directing the facility's employees and processes. Plaintiff testified that he suffered no discrimination under Mr. Harrison's supervision, despite the negative comments in his reviews. Many of Mr. Gutierrez's negative comments repeat and reiterate the criticisms provided by Mr. Harrison. Therefore, Plaintiff's allegation of discriminatory evaluations is contradictory and without merit.

It is noteworthy that Plaintiff never made any formal complaint to anyone at the company about race discrimination of any kind. After he was placed on a Performance Improvement Plan in 2016, he testified that he spoke to the Controller and the site HR manager once in Canton to ask whether they had seen prior General Managers treated the way he believed he was being treated. *Id.* at 129. He expressed his belief that at first he just thought Mr. Gutierrez was "anal with everybody" but that he felt that it was more directed toward him. *Id.* at 131-132. When the site's HR manager gave him the opportunity to make a formal complaint, Plaintiff declined to do so. *Id.*

Ultimately, Plaintiff acknowledges that the sole reason for his conclusion that he was discriminated against was that he was the only black General Manager working in the facilities supervised by Mr. Gutierrez. He therefore concluded that his perceived mistreatment must be because of his race. *Id.* at 135, 170 ("I'm going to say I was the only one that was mistreated due to the fact that I was the only African-American and general manager";). Plaintiff's own subjective belief that WWL acted based on race discrimination is not sufficient to show that WWL's reasons were pretext for discriminatory motivations. *Johnson v. Hinds County Public Works,* 2006 WL 2701195 *3 (S.D. Miss. 2006).

53230669

In sum, WWL's reasons for its decision to terminate Plaintiff's employment rebut any presumption of discrimination.   WWL is entitled to summary judgment on Plaintiff's discrimination claim because he has no competent evidence that all of WWL's non-discriminatory reasons were pretextual and that discriminatory animus was the real reason for the decision.

### D.  Plaintiff Has No Evidence to Support a Hostile Work Environment Claim.

Plaintiff's Complaint alleges a hostile work environment. The circumstances alleged by Plaintiff do not rise to the level legally cognizable as creating a hostile work environment under Title VII or Section 1981.  To prevail on a hostile environment claim, a plaintiff must show (1) he belongs to a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his race, (4) the harassment was so severe or pervasive it affects a term, condition, or privilege of employment, and (5) the employer knew, or should have known, about the harassment and failed to take remedial action.  *Gibson v. Potter*, 264 Fed. Appx. 397, 400-01 (5th Cir. 2008) (citing *Green v. Adm'rs of the Tulane Educ. Fund,* 284 F.3d 642, 655 (5th Cir.2002)).  As a matter of law, a Title VII violation occurs only where the workplace is permeated with "discriminatory intimidation, ridicule, and insult … sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotations omitted); *Vallecillo v. U.S. Dept. of Housing & Urban Development*, 155 Fed. Appx. 764, 766-767, 2005 WL 3115080, *1, *2 (5th Cir. 2005).

In deciding whether an environment is hostile or abusive, courts look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with []

53230669

performance." *Harris*, 510 U.S. at 23; *Harvill v. Westward Comm., L.L.C.,* 433 F.3d 428, 434 (5th Cir. 2005). A plaintiff is required to affirmatively show offensive conduct so severe or pervasive that it affected a term, condition, or privilege of employment. *See Green,* 284 F.3d 642, 655-56 (5th Cir. 2002). The test is whether the conduct qualifies as both "subjectively and objectively offensive." *Id*. at 655.

Plaintiff alleged absolutely no harassment sufficiently severe or pervasive to rise to the level of a legally cognizable claim for hostile work environment. The "severe and pervasive" prong requires Plaintiff to show more than a few isolated incidents of racial enmity. *McCray v. DPC Industries, Inc.,* 942 F.Supp. 288 (E.D. Tex. 1996). Plaintiff can provide no evidence to support any incident of racial enmity. He testified that no one at WWL ever said anything to him verbally that was derogatory about his race. (Ex. 1, Plaintiff Dep. 30) He alleged no verbal or physical threats, racial or otherwise, by anyone at WWL. His allegations, summarized below, do not rise to the level of hostile work environment.

First, Plaintiff alleged that because he is black, he was "nitpicked" and made to do extra work by his supervisor, Mr. Gutierrez, work that was allegedly not required of other General Managers in the locations supervised by Mr. Gutierrez. *Id*. at 124. Plaintiff's examples included being required to make sure parking areas were free of trash, to keep office spaces and cords neat, and to keep the shop floor areas in accordance with the company's "5S" system.[3] *Id*.at 23-24, 29. Plaintiff admitted that he was always able to achieve the directives given by Mr. Gutierrez with regard to the company-wide "5S" system. *Id*. at 134. Plaintiff based his allegation on his occasional visits to two other facilities under Mr. Gutierrez's supervision: Los Angeles,

---

[3] Plaintiff explains that 5S refers to "principles of the shop floor activity"; he says it means "short store sign, systemized and standardized." (Ex. 1, Plaintiff Dep. 28) Mr. Gutierrez further explained that it is "a very standard methodology that every single automotive industry or company uses. And that it's being utilized in many multiple industries… but especially manufacturing, where the environment can be dangerous or risky. So… it's applied to bring cleanest and safe environment for the employees." (Ex. 4, Gutierrez Dep. 92-93)

California, and Smyrna, Tennessee.  Plaintiff alleged that he saw trash in their lots and that their offices were not set up according to the guidelines required of him. *Id.* at 23-24.  Plaintiff acknowledged that all of Mr. Gutierrez's facilities were required to meet "5S" requirements, though he believed he was held to a "higher standard of a 5S" in Canton.  *Id.* at 28-29.  Yet, Plaintiff merely assumed that he was held to this perceived higher standard because of his race. *Id.*  Plaintiff admitted that he was never reprimanded for these issues, and that they were not part of his performance appraisals.  *Id.* at 29.

Second, Plaintiff alleged that because of his race, Mr. Gutierrez required him to provide rides to dinner and his hotel when Mr. Gutierrez traveled to the Canton facility.  *Id.* at 25. Plaintiff stated that Mr. Gutierrez also expected Plaintiff to have dinner with him when he was in town and that Mr. Gutierrez would discuss work, which Plaintiff complained about because he was "off the clock."  *Id.* at 26. In light of Plaintiff's salaried status, high pay, and the nature of his role at the facility, an after work dinner where work was discussed is certainly not racially discriminatory or an element of a hostile work environment. Additionally, Plaintiff made no showing that this treatment was different from the way Mr. Gutierrez treated the other General Managers under his supervision. Plaintiff acknowledged that there was no need for Mr. Gutierrez to request rides from the General Manager at the Smyrna, Tennessee location since Mr. Gutierrez lived nearby and worked out of the Smyrna location.  *Id.* at 27.  He also admitted that the General Manager in Los Angeles, California, had dinners with Mr. Gutierrez when Mr. Gutierrez was in town.  *Id.* at 69.

Third, Plaintiff made vague complaints of alleged discrimination by two employees under his authority at the Canton facility.  Plaintiff alleged that he heard "rumors" that employee Robert Renfroe did not like having a black man in charge of the facility. *Id.* at 41. He also

53230669

testified that Mr. Renfroe and another employee, Paul Wishork, would stop talking with each other when Plaintiff walked up. *Id.* at 43. Plaintiff testified that he didn't think the men were necessarily talking about him because of his race, but he believed that his race was part of the reason the employees allegedly did not handle some of their responsibilities. *Id.* Plaintiff admitted that he was the ultimate supervisor for these employees; though he testified that he never reprimanded either employee for discriminatory behavior; at one point he testified that he instructed one of their direct supervisors to discipline them for failing to complete work responsibilities. *Id.* at 41. Allegations of "rumors" of words possibly spoken by Plaintiff's subordinates are insufficient to establish a "severe and pervasive" hostile work environment.

Finally, Plaintiff alleged that Mr. Gutierrez "raised his voice," "several times, but not all the time," when on the phone with Plaintiff. *Id.* at 142-143. Plaintiff complained about Mr. Gutierrez "saying things on the phone about my performance, what's not being done, what needs to be done, this isn't right, those type of things." *Id.* As Plaintiff's supervisor, Mr. Gutierrez was responsible for monitoring and overseeing Plaintiff's performance.

None of Plaintiff's allegations, detailed above, rise to the level of a hostile work environment. They consist of little more than, in Plaintiff's words, "nitpicking," expecting Plaintiff, the highest paid employee at the Canton facility, to have work dinners, and addressing areas that need improvement. Plaintiff's own testimony fails to demonstrate acts by Defendant that are "severe" or "pervasive." Therefore, Plaintiff's allegations of a hostile work environment re entirely unsupported and without merit.

## IV.   Plaintiff's Emotional Distress Claims Are Without Merit.

Plaintiff alleges both intentional and negligent infliction of emotional distress in his Complaint. Both claims are without merit.

20

A.        **Intentional Infliction of Emotional Distress**

Ordinarily, damages for intentional infliction of emotional distress are not recoverable in employment disputes.  *See Johnson v. Merrell Dow Pharmaceutical, Inc.,* 965 F.2d 31, 33 (5th Cir. 1992); *Brown v. Inter-City Bank for Savings,* 738 So.2d 262, 265 (Miss. Ct. App. 1999). "Only in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as required for the tort of intentional infliction of emotional distress." *Id.*; *Prunty v. Ark. Freightways, Inc*., 16 F.3d 649, 654 (5th Cir.1994) (citations omitted).   "Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *Pegues v. Emerson Elec. Co.*, 913 F. Supp. 976, 982-83 (N.D. Miss. 1996). This case is far from "extreme and outrageous" and offers no basis for Plaintiff's claims of negligent or intentional emotional distress.

To maintain an action for intentional infliction of emotional distress, Plaintiff must establish that:  (1) the emotional distress was a reasonably foreseeable result of WWL's conduct; and (2) WWL's conduct was malicious, intentional, or outrageous.  *Adams v. U.S. Homecrafters, Inc.*, 744 So.2d 736, 743 (Miss. 1999).  "Meeting the requisite elements of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Jenkins v. City of Grenada*, 813 F. Supp. 443, 446 (N.D. Miss. 1993).  The inquiry focuses on the conduct of the defendant, not the physiological condition of the plaintiff.  *Jenkins*, 813 F. Supp. at 446.  Courts are to focus on the nature of the act itself, rather than on the seriousness of its consequences, in determining whether a cause of action lies for intentional infliction of emotional distress.  *Id.*

For Plaintiff's claim to succeed, Plaintiff's distress must have been the "foreseeable

53230669

result" of some malicious, intentional, or outrageous conduct by WWL.  Further, WWL's

conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all

bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized

community."  *Brown v. Inter-City Bank for Savings,* 738 So.2d 262, 264 (Miss. Ct. App. 1999);

*Morrison v. Means,* 680 So. 2d 803, 805-06 (Miss. 1996) (quoting Restatement (Second) of

Torts § 46, cmt. d (1977)).  There is no evidence that any conduct on the part of WWL was

"extreme or outrageous" or evokes outrage or revulsion.  In fact, the evidence is to the contrary.

Plaintiff's allegations that he was "nitpicked" by Mr. Gutierrez, required to have dinner and drive

Mr. Gutierrez to his hotel, or that he received criticisms of his work performance in his

evaluations certainly cannot rise to this level.

## B.      Negligent Infliction of Emotional Distress.

Plaintiff cannot recover emotional distress damages for merely negligent conduct absent

showing some physical injury.  *Franklin Collection Servs., Inc. v. Kyle*, 955 So. 2d 284, 290

(Miss. 2007) "There can be no recovery for mental pain and suffering from the mere negligent

act of another unaccompanied by physical or bodily injury." *Id.* (*quoting Sears, Roebuck & Co.*

*v. Devers,* 405 So.2d 898, 902 (Miss.1981)).  In *Franklin Collection*, because the plaintiff failed

to present any evidence of physical or bodily injury, her claim for negligent infliction of emotion

distress could not survive summary judgment.  *Id.*

Plaintiff alleges that he developed high blood pressure as a result of the alleged

discrimination, and that he had some sleepless nights prior to his termination due to "worrying

about my job."  Indeed, the General Manager position is one of tremendous responsibility that,

like many careers, can induce a corresponding level of stress.  *See* Ex. 2, Job Description.

Plaintiff has testified that he suffered no discrimination until Mr. Gutierrez became his

supervisor in 2015.  (Ex. 1, Plaintiff Dep. 39)  He points to a medical visit in August 2016, a year and a half after he began working under Mr. Gutierrez, where he was diagnosed with high blood pressure at a reading of 142/95. (Ex. 12, Medical Record Excerpts, WWL-MEA Subpoena 000006)  At that visit, his height is recorded as 72 inches and weight was 329 pounds.  *Id.* However, during a visit two years earlier, prior to Plaintiff's supervision by Mr. Gutierrez, in August 2014, Plaintiff's blood pressure was recorded as 155/103, notably higher than the visit Plaintiff presents in an effort to support his claim.  *Id.* at WWL-MEA Subpoena 000010.   In August 2014, when he had a very high blood pressure reading, Plaintiff was not working under Mr. Gutierrez.  He had been promoted to the General Manager position earlier that year, but was working under Mr. Harrison.  Plaintiff has testified that he suffered no discrimination during the timeframe that he worked under Mr. Harrison.

Plaintiff later took himself off of his blood pressure medication on his own.  He testified that he has never been treated depression or anxiety, or taken medication for sleeping, and offers no further medical support for his claims.  *Id.* at 152.  At the time of his deposition on July 13, 2018, his medical records reflect that he had not seen a doctor since December 2016, when a cough sent him to MEA Medical Clinics. (Ex. 12, Excerpted Medical Records)

None of Plaintiff's medical complaints prevented him from working at any point, for WWL or for his subsequent employers. There is also no link between Plaintiff's alleged high blood pressure and the alleged discrimination, particularly considering that his blood pressure had been high two years earlier, before the alleged discrimination took place. There is simply no evidence to support Plaintiff's claim for negligent infliction of emotional distress.

**V.**     <u>**Plaintiff's Negligence Claim Is Without Merit.**</u>

Plaintiff makes a claim of negligence that essentially regurgitates his race discrimination

claims. Plaintiff has articulated no facts giving rise to a *prima facie* negligence claim. Specifically, he has not established facts showing duty, breach, causation, or damages. *Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1, 3 (Miss. 2007). Plaintiff cannot establish a negligence claim for the same reasons, *supra,* that Plaintiff cannot make a case for race discrimination.

## VI.  **Plaintiff's Punitive Damages Claim Is Without Merit.**

Punitive damages are recoverable if the plaintiff shows that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Smith v. Xerox Corp.*, 2010 WL 1052837 *10 (5th Cir. March 24, 2010). This standard is higher than the showing necessary for compensatory damages. *Id.* (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)). As explained in detail previously in this memorandum, the record is void of evidence showing that WWL acted "with malice or with reckless indifference" to Plaintiff's rights. Plaintiff is therefore not entitled to punitive damages.

### **CONCLUSION**

Plaintiff cannot make a *prima facie* case of race discrimination, emotional distress, or negligence, there is no evidence to demonstrate that WWL's explanation of its alleged discriminatory acts is mere pretext. WWL is therefore entitled to summary judgment in its favor as to all of Plaintiff's claims.

Respectfully submitted, this the 19th day of October, 2018.

> **WWL VEHICLE SERVICES**
> **AMERICAS, INC.**
>
> */s/ Laura F. Rose*
> Elizabeth Lee Maron (MSB #10133)
> Laura F. Rose (MSB # 102256)
> Adams and Reese LLP

53230669

1018 Highland Colony Parkway, Suite 800
Ridgeland, Mississippi 39157
(p) 601-353-3234
(f) 601-355-9708
elizabeth.maron@arlaw.com
laura.rose@arlaw.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

Ken R. Adcock
William C. Ivison
Adcock & Morrison, PLLC
795 Woodlands Parkway, Suite 220
Ridgeland, Mississippi 39157
P.O. Box 3308
Ridgeland, Mississippi 39158

THIS the 19th  day of October, 2018.

*/s/ Laura F. Rose*

25

53230669